IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Levone Footman, | ) |
|                               Plaintiff, | ) Civil Action No. 6:16-3361-TMC-KFM ) **REPORT OF MAGISTRATE JUDGE** |
| vs. | ) |
| Nancy A. Berryhill, Acting Commissioner of Social Security, | ) |
|                             Defendant. | ) |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a)(D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Section 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for supplemental security income under Title XVI of the Social Security Act.

**ADMINISTRATIVE PROCEEDINGS**

The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on February 4, 2008, alleging that he became unable to work on June 27, 2005. Both applications were denied initially and on reconsideration by the Social Security Administration. The plaintiff later amended his alleged onset date of disability to August 15, 2007. On March 27, 2009, the plaintiff requested a hearing. Administrative law judge ("ALJ") Linda R. Haack, before whom the plaintiff and an impartial vocational expert appeared on May 6, 2010, considered the case

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

*de novo*, and on June 25, 2010, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended (Tr. 86-106). The Appeals Council denied the plaintiff's request for review on July 13, 2011 (Tr. 110-14).

The plaintiff filed another application for SSI on January 3, 2011, alleging disability beginning June 27, 2005. The claim was denied initially and upon reconsideration. On August 29, 2011, the plaintiff requested a hearing. The plaintiff appeared and testified before ALJ Edward T. Morriss on November 15, 2012. On January 24, 2013, the ALJ issued a decision denying the plaintiff's application for benefits (Tr. 119-27). On April 3, 2014, the Appeals Council granted the plaintiff's request for review and remanded the case to the ALJ with the following directions:

> Include decisional language explaining which findings from the prior decision, which was issued on June 25, 2010, remain binding and which do not;
>
> Give further consideration to the claimant's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations (Social Security Ruling 96-8p);
>
> Obtain evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Ruling 83-14).

(Tr. 135-37).

On August 13, 2015, a second hearing was held. The plaintiff and Mark A. Stebnicki, an impartial vocational expert, appeared at the hearing. On October 8, 2015, ALJ Morriss found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on August 8, 2016.[2] The plaintiff then filed this action for judicial review.

---

[2] The ALJ decision before the court for judicial review concerns only the plaintiff's January 2011 application for SSI (Tr. 14-24).

2

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1) The claimant has not engaged in substantial gainful activity since January 3, 2011, the application date (20 C.F.R. § 416.971 *et seq.*).
>
> (2) The claimant has the following severe impairments: HIV, degenerative joint disease of the shoulders, and degenerative disc disease (20 C.F.R. § 416.920(c)).
>
> (3) The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926).
>
> (4) After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 416.967(b). Specifically, the claimant can lift and carry up to 20 pounds occasionally and 10 pounds frequently and stand, walk, and sit for 6 hours each in an 8-hour work day. The claimant can frequently push/pull with his shoulders bilaterally and frequently push/pull with his right knee; however, he can only occasionally push/pull with his left ankle. He can frequently balance, kneel, and crawl but only occasionally stoop, crouch, and climb ramps and stairs. Additionally, the claimant can never climb ladders, ropes, or scaffolds. He can frequently handle and finger with his bilateral upper extremities but only occasionally reach overhead with his bilateral upper extremities. Furthermore, the claimant must avoid concentrated exposure to extreme cold, extreme heat, and humidity. He must not work around heights or moving machinery.
>
> (5) The claimant is unable to perform any past relevant work (20 C.F.R. § 416.965).
>
> (6) The claimant was born on August 4, 1962, and was 48 years old, which is defined as a younger individual age 18-49, on the date the application was filed. The claimant subsequently changed age category to closely approaching advanced age (20 C.F.R. § 416.963).
>
> (7) The claimant has a limited education and is able to communicate in English (20 C.F.R. § 416.964).

>   (8) Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).
>
>   (9) Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. § 416.969(a)).
>
>   (10) The claimant has not been under a disability, as defined in the Social Security Act, since January 3, 2011, the date the application was filed (20 C.F.R. § 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## **APPLICABLE LAW**

Under 42 U.S.C. § 1382c(a)(3)(A), (H)(i), as well as pursuant to the regulations formulated by the Commissioner, the plaintiff has the burden of proving disability, which is defined as an "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a).

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that meets or medically equals an impairment contained in the Listing of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1, (4) can perform his past relevant work, and (5) can

perform other work. *Id.* § 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 416.920(a)(4).

A claimant must make a *prima facie* case of disability by showing he is unable to return to his past relevant work because of his impairments. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983). Once an individual has established a *prima facie* case of disability, the burden shifts to the Commissioner to establish that the plaintiff can perform alternative work and that such work exists in the national economy. *Id.* (citing 42 U.S.C. § 423(d)(2)(A)). The Commissioner may carry this burden by obtaining testimony from a vocational expert. *Id.* at 192.

Pursuant to 42 U.S.C. § 405(g), the court may review the Commissioner's denial of benefits. However, this review is limited to considering whether the Commissioner's findings "are supported by substantial evidence and were reached through application of the correct legal standard." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Id.* In reviewing the evidence, the court may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Id*. Consequently, even if the court disagrees with Commissioner's decision, the court must uphold it if it supported by substantial evidence. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

**EVIDENCE PRESENTED**

The plaintiff was born on August 4, 1962 (Tr. 360). He completed the tenth grade and has past relevant work as a truck driver (Tr. 22, 340). He alleges that he became disabled to work on June 27, 2005, due to problems with his heart, feet, and shoulders, and diabetes (Tr. 340).

5

The plaintiff saw Timothy E. West, M.D., at Lowcountry Infectious Diseases and was found to be HIV positive in January 2008. Dr. West prescribed Atripla on May 21, 2008 (Tr. 447-48). The plaintiff was seen for followup appointments on August 14, September 12, and December 5, 2008 (Tr. 444-46). On February 10, 2009, Dr. West noted the plaintiff's multiple medical problems, including diabetes, hypertension, gastroesophageal reflux disease ("GERD"), hyperlipidemia, and chronic pain (Tr. 443).

On March 30, 2009, the plaintiff was seen at Black River Health Care and reported continued chest pain, which worsened with lying down at night. He had left ankle pain and GERD (Tr. 477).

On April 1, 2009, the plaintiff visited Vitt Leng, M.D., at Advance Cardiology Consultants. The plaintiff had palpitations and chest pain (Tr. 429). On April 6, 2009, a cardiac echocardiogram showed left ventricular hypertrophy with mild mitral and tricuspid regurgitation (Tr. 434). On April 9, 2009, the plaintiff reported chest pain when he laid down (Tr. 428).

On April 29, 2009, the plaintiff saw A. Dawson, M.D. The plaintiff was using a cane, and he reported pain in his right foot and on the left side of his neck. He stated he had tingling in his neck. Dr. Dawson found the plaintiff to have limited range of motion of his neck and left trapezius spasms. There was also pain with the left ankle range of motion. Percocet was prescribed (Tr. 512).

On May 4, 2009, the plaintiff was seen at Black River Health Care for neck and a tingling sensation on his left side (Tr. 475).

On May 20 and July 23, 2009, the plaintiff was diagnosed by Dr. Leng with non-ischemic chest pain, partially controlled hypertension, and diabetes (Tr. 423, 425).

On June 29, 2009, Dr. West saw the plaintiff for a followup of his HIV infection, but also documented the plaintiff's fatigue, chronic pain in shoulders and knees,

6

numbness and tingling, and diarrhea. His blood glucose was 362, higher than Dr. West ever wanted to see (Tr. 442).

On September 14, 2009, the plaintiff reported low blood sugars in the mornings (Tr. 471). On October 22, 2009, the plaintiff had decreased range of motion of the cervical spine due to pain (Tr. 469).

On February 5 and July 21, 2010, the plaintiff was seen again by Dr. West who recorded the plaintiff's right knee problems. The plaintiff was using a crutch (Tr. 440).

On June 3, 2010, the plaintiff returned to Dr. Dawson. The plaintiff was still using a cane. He said his left foot cramped and swelled. Straight leg raise tests were positive bilaterally. The plaintiff had limited range of motion of his hips and neck. He also had numbness of the left and right third, fourth, and fifth fingers (Tr. 511). On July 15, 2010, Dr. Dawson noted the plaintiff's right knee pain. An MRI showed a possible loose body at the lateral fossa, and arthroscopic surgery was discussed. The plaintiff had pain with extension and flexion of both knees, and he walked with a limp and a cane (Tr. 511). The plaintiff continued to walk with a limp and a cane on August 4, September 8, and November 17, 2010. He had limited range of motion of the right knee. He had shoulder, back, hip, and bilateral knee pain. He still had some numbness in his right hand. He had numbness of the left medial nerve distribution. Dr. Dawson felt the plaintiff was a candidate for left carpal tunnel release surgery (Tr. 509-11).

On August 26, 2010, the plaintiff was seen at Black River Health Care for pain in his shoulder and leg (Tr. 466).

On November 24, 2010, Dr. West wrote that the plaintiff ached in quite a few places. His ankle was bothering him, his diabetes was poorly controlled, and he had some renal impairment (Tr. 439). On November 30, 2010, the plaintiff's diabetes was uncontrolled (Tr. 465).

7

On March 24, 2011, Hugh Wilson, M.D., reviewed the plaintiff's medical records and opined that he could occasionally lift and/or carry 20 pounds and frequently lift and/or carry ten pounds. The plaintiff could stand and walk for two hours and sit for six hours in an eight-hour workday. He could occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl. He could occasionally reach overhead with bilateral upper extremities. He could frequently balance and frequently handle and finger items with bilateral upper extremities (Tr. 514-16).

On July 25, 2011, Robert H. Heilpern, M.D., opined that the plaintiff could perform light work, but he was limited to frequent pushing and pulling with the right knee, occasional pushing and pulling with the left ankle, and frequent pushing and pulling with both shoulders. The plaintiff could occasionally climb ramps and stairs, stoop, and crouch. He could frequently balance, kneel, and crawl, but never climb ladders, ropes, and scaffolds. The plaintiff was limited to occasional overhead reaching and frequent handling and fingering. He should avoid concentrated exposure to extreme cold and heat, humidity, and hazards (Tr. 535-38).

Dr. West saw the plaintiff on February 27 and August 27, 2012. The plaintiff was having frequent bowel movements. He also had increasing problems with his back, and an MRI showed disc disease of the lower back (Tr. 666, 668).

On March 14, 2012, the plaintiff reported ankle pain to Timothy R. Wagner, M.D., at Lake City Orthopaedic Clinic. Dr. Wagner diagnosed bilateral leg numbness, pain, and left sciatica. Dr. Wagner thought he might need to increase the Neurontin dosage or prescribe Lyrica. He did not recommend surgery because of the plaintiff's diabetes (Tr. 601-02). On June 13, 2012, the plaintiff had problems with progressive pain and weakness in his left leg and right arm. He was diagnosed with cervical spine degenerative arthritis. Dr. Wagner thought the plaintiff should see a neurologist (Tr. 600).

8

On September 25, 2012, the plaintiff was seen at Florence Rehabilitation Medicine. An MRI of his lumbar spine showed degenerative disc changes, a left paracentral disc bulge at L4-L5, and mild facet hypertrophy at L5-S1 (Tr. 575). On October 1, 2012, an electrodiagnostic study of bilateral lower and right upper extremity was performed. All motor nerves showed decreased conduction velocities with low amplitudes seen in several areas. The EMG showed changes in multiple muscles in the upper and lower extremities. The changes were consistent with peripheral neuropathy (Tr. 580).

On March 29, 2013, Dr. West wrote that the plaintiff's diarrhea had been intermittent for at least one year and may be related to diabetes (Tr. 672). Dr. West saw the plaintiff on July 5 and November 27, 2013, and on March 28, 2014 (Tr. 673, 676, 680).

On August 12, 2013, the plaintiff saw Rose Gibbs, M.D., at Berkeley Medical Center and reported that his sugars were up and down (Tr. 649). On September 12, 2013, the plaintiff had continued lower back and leg pain. His HbA1c improved from 15.9 to 9.7 (Tr. 650-51).[3] On March 21, 2014, the plaintiff was seen for hypertension, hyperlipidemia, diabetes, diabetic retinopathy, back pain, GERD, renal insufficiency, and hyperkalemia. Dr. Gibbs referred him to a back specialist (Tr. 636). On March 31, 2014, the plaintiff was seen after going to the emergency room for numbness in his foot and lower leg. It was discovered that he had pneumonia. Dr. Gibbs found the plaintiff had B12 deficiency, peripheral neuropathy, and numbness and tingling in his left arm and leg (Tr. 637-38). On April 15, 2014, the plaintiff's HbA1c was very high at 15. He continued to have neck pain and numbness. He also experienced dyspnea (Tr. 639-40).

On July 17, 2014, Howard N. Greene, M.D., of Carolina Center for Sight examined the plaintiff. His impression was senile nuclear sclerosis OU; cortical senile

---

[3] The HbA1c test provides information about a person's average levels of blood glucose over the past three months. A normal level is below 5.7 percent. *See* https://www.niddk.nih.gov/health-information/diabetes/overview/tests-diagnosis/a1c-test (last visited Jan. 2, 2018).

9

cataract OU; pterygium unspecified OD; pinguecula OS; diabetes mellitus with ophthalmic manifestations, type I, uncontrolled, OU; diabetic macular edema OU; severe nonproliferative diabetic retinopathy OU; and retinal exudates and deposits OD (Tr. 822).

On August 1, 2014, Dr. West changed the plaintiff's HIV medications due to problems with his renal function. The change caused shortness of breath (Tr. 684).

On August 14, 2014, John Patton, IV, M.D., at McLeod Physician Associates, saw the plaintiff upon referral from Dr. Gibbs after an abnormal EKG. The plaintiff had dyspnea on exertion and chest pain. The plaintiff's diabetes was poorly controlled based on the last A1c (Tr. 655-57). On September 24, 2014, the plaintiff continued to have dyspnea with exertion. Dr. Patton referred him to pulmonary diseases for persistent shortness of breath (Tr. 652-53). Vinod K. Jona, M.D., diagnosed the plaintiff with probable bronchitis and chronic obstructive pulmonary disease ("COPD") (Tr. 716). The plaintiff was started on inhaler therapy (Tr. 746).

On October 31, 2014, the plaintiff was seen for diabetes, hypertension, weight loss, renal insufficiency, back pain, and a bacterial infection (Tr. 633). On December 2, 2014, the plaintiff reported pain in his lower back and legs. He was taking Spiriva and Symbicort for COPD (Tr. 786-88).

On March 11, 2015, Dr. Gibbs increased the plaintiff's gabapentin dosage due to numbness in feet and hands (Tr. 783-84). On March 20, 2015, Dr. West changed the plaintiff's medication because his renal function was still rising (Tr. 740).

On April 6, 2015, the plaintiff was seen by Jeffrey R. Armstrong, DPM, and Keith D. Merrill, M.D., at Roper St. Francis, for burning in his feet. The pain had progressively worsened to the point it was a daily occurrence that limited his level of activity. Dr. Armstrong noted a limited range of motion of the plaintiff's ankle. Lyrica and diabetic shoes were prescribed (Tr. 776-77). On May 4, 2015, it was noted that Lyrica was not covered by the plaintiff's insurance. He continued to take gabapentin, but saw no

improvement (Tr. 771). On the same date, Dr. Merrill found the plaintiff had limited range of motion of the cervical spine. He would try to send him for cervical epidurals, but they would probably not be allowed by his insurance. Another possible treatment was a Medrol dosepak, but Dr. Merrill was afraid it would interfere with the plaintiff's blood sugars (Tr. 774).

On June 8, 2015, the plaintiff was seen again at the Carolina Center for Sight for decreased vision due to an abrasion on his right eye (Tr. 806).

On June 11, 2015, the plaintiff was seen for diabetes, a corneal abrasion, cataracts, and peripheral neuropathy in hands and feet (Tr. 780-81).

On June 15, 2015, the plaintiff returned to see Dr. Armstrong for burning in his feet (Tr. 766). He also saw Dr. Merrill for pain in his neck and right upper extremity. Because the insurance company denied epidural steroid injections, Dr. Merrill was unsure of what else to do. He referred the plaintiff to John Steichen, M.D., neurosurgery (Tr. 768-69).

On July 22, 2015, the plaintiff was admitted to McLeod Regional Medical Center for uncontrolled diabetes. He was diagnosed with diabetic ketoacidosis and acute kidney failure (Tr. 803, 843-46). The plaintiff was initially seen in the emergency room with blood glucose of 700 (Tr. 845).

On August 11, 2015, Dr. Gibbs wrote that it was her opinion that the plaintiff was not able to perform full-time work due to his insulin dependent diabetes, which was difficult to control, neck and arm pain, diabetic neuropathy of the feet and legs, and leg pain (Tr. 801).

During the administrative hearing on August 13, 2015, the ALJ remarked that the plaintiff was wearing sunglasses and that he reported that he had surgery recently on his right eye (Tr. 37). The plaintiff testified that he had coronary artery disease, diabetes, left ankle deformity, carpal tunnel syndrome, cervical monopathy [phonetic], degenerative

disc disease, and recent eye surgery. The plaintiff had a growth removed and cataract surgery on his right eye. He was returning in six weeks to have cataract surgery on his left eye. The plaintiff had recently been admitted to the hospital with severe dehydration and elevated glucose above 700. He was assessed for kidney damage (Tr. 39-41).

The plaintiff testified that his vision was blurry. Sunlight burned his eyes, and he was sensitive to the light. He could not watch television because focusing caused pain and gave him a headache. The plaintiff had surgery on his right and left rotator cuffs. He could not reach up and could only bend at the elbows. He stated that he kept his arm folded because if he let his arm hang down it hurt. He kept his arm resting on something to keep the pressure off of his shoulders. The plaintiff lived with his son, who was 14 years old. The plaintiff's son and sister did the daily activities around the house. The plaintiff was unable to do household chores because he had carpal tunnel surgery on his hand and he could not hold things. He dropped plates when he tried to wash them (Tr. 41-43). His sister cooked for him. His son washed the clothes and cut the grass. The doctors told him that they would not know if his eye surgery was successful for another six weeks. They told him he would probably have about 50% of his vision back in his right eye (Tr. 47-50).

The plaintiff testified that his feet hurt all of the time and that they felt like they were in a bucket of boiling water. His feet felt like there were needles sticking in them, and when he walked, it felt like he was walking on rocks. The plaintiff took showers with cold water because his feet burned in warm water. The plaintiff used a cane because his back and legs went out. His doctor told him he needed an operation on his right knee (Tr. 43-44).

The plaintiff was diagnosed with coronary artery disease. He had undergone a heart catheterization. He was experiencing shortness of breath. He had COPD and was on two different inhalers. His medications made him drowsy and upset his stomach. The plaintiff's HIV was under control and treated by Dr. West. The plaintiff woke up around 7:00 a.m. and took his medications. He mostly slept sitting in his recliner due to back problems.

After taking his medicine, he went back to sleep or listened to the radio. He mostly sat on the porch. The plaintiff went to the restroom ten times a day. He tried to not drink too much liquid in order to not have to go to the restroom so frequently. His legs wore out on him, and sometimes he wet his pants before he got to the bathroom. He became dehydrated because he stopped drinking liquids in order to not have to go to the bathroom so frequently (Tr. 45-46).

The vocational expert classified the plaintiff's past work as that of truck driver, long haul, *Dictionary of Occupational Titles* ("*DOT*") #905.663-014, medium, Specific Vocational Preparation ("SVP") of 4, performed as heavy work (Tr. 55-56). The ALJ proposed the following hypothetical:

> Assume I find the claimant is 53 years old. Has a ninth grade education. Assume I find he can perform light work. He's limited to frequent . . . pushing and pulling with his shoulders bilaterally. Frequent pushing and pulling with his right knee. Occasional pushing and pulling with the left ankle. Is able to frequently balance, kneel, and crawl. Can occasionally stoop, crouch, and climb ramps and stairs. Unable to climb ladders, ropes, or scaffolds. Is limited to frequent handling and fingering with the bilateral upper extremities. Occasional overhead reach with bilateral upper extremities. Needs to avoid concentrated exposure to extreme cold, heat, and humidity. And is unable to work at heights or around moving machinery.

(Tr. 56-57).

The vocational expert stated that the individual could perform work as a shipping and receiving weigher, *DOT* #222.387-074, light, SVP of 2, with 500 jobs regionally and 29,000 jobs nationally; box sealing inspector, *DOT* #641.687-014, light, SVP of 2, with 3,200 jobs regionally and 135,000 jobs nationally; and information clerk, *DOT* #327.367-018, light, SVP of 2, with 535 jobs regionally and 60,000 jobs nationally (Tr. 57).

The vocational expert testified that an individual that required unscheduled work breaks of an average of two hours for each eight-hour day could not perform any work. The vocational expert described the duties of three jobs that he cited. The vocational expert

stated that an individual who was absent three to four days of work each month would not be able to work (Tr. 58-60).

## **ANALYSIS**

The plaintiff argues that the ALJ erred by (1) failing to properly assess the medical opinion evidence; (2) failing to properly evaluate his credibility; and (3) failing to properly explain the residual functional capacity ("RFC") assessment (doc. 18 at 16-34).

***Medical Opinion Evidence***

The regulations require that all medical opinions in a case be considered. 20 C.F.R. § 416.927(b). The regulations further direct ALJs to accord controlling weight to a treating physician's opinion that is well-supported by medically-acceptable clinical and laboratory diagnostic techniques and that is not inconsistent with the other substantial evidence of record. *Id.* § 416.927(c)(2). If a treating physician's opinion is not given controlling weight, the ALJ must proceed to weigh the treating physician's opinion, along with all the other medical opinions of record, based upon the following non-exclusive list of factors: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3) the nature and extent of the treatment relationship; (4) the evidence with which the physician supports his opinion; (5) the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* § 416.927(c)(1)-(5).[4] *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005).

The plaintiff first argues that the ALJ failed to properly consider the medical opinion of treating physician Dr. Gibbs (doc 18 at 18-25). On August 11, 2015, Dr. Gibbs

---

[4] These regulations apply for claims, like the plaintiff's, filed before March 27, 2017. *See* 20 C.F.R. § 416.927. For claims filed on or after March 27, 2017, a new regulatory framework for considering and articulating the value of medical opinions has been established. *See id.* § 416.920c. *See also* 82 FR 5867, 2017 WL 168819 (revisions to medical evidence rules dated Jan. 18, 2017, and effective Mar. 27, 2017).

wrote that it was her opinion that the plaintiff was unable to perform full-time work due to his "difficult to control insulin dependent diabetes; neck and arm pain, secondary to cervical spondylosis; diabetic neuropathy of the feet and legs; and leg pain . . ." (Tr. 801). The ALJ did not specify how much weight was assigned to the opinion. However, he stated that the opinion was not supported by treatment notes showing the plaintiff's diabetes, neuropathy, and leg pain were "generally well controlled with medications." Additionally, the ALJ stated that the plaintiff's cervical spondylosis symptoms had not lasted 12 continuous months and that the plaintiff was never recommended for surgery or physical therapy for his symptoms (Tr. 21).

The plaintiff argues that the ALJ failed to evaluate evidence supportive of Dr. Gibbs' opinion. Specifically, the plaintiff argues that the medical evidence does not support a finding that his diabetes, neuropathy, and leg pain were well controlled with medications and that his cervical spondylosis symptoms had not lasted 12 continuous months. The undersigned agrees.

In support of his finding that the plaintiff's diabetes, neuropathy, and leg pain were well controlled with medications, the ALJ cites Exhibits C26F and C28F (Tr. 21 (citing Tr. 743-64, 780-99)). Exhibit 26F consists of treatment notes from Dr. Patton, who treated the plaintiff for dyspnea on exertion and chest pain (Tr. 743-64). On August 14, 2014, Dr. Patton noted the plaintiff's diabetes was poorly controlled based on his last HbA1c (Tr. 656). Exhibit 28F consists of treatment notes from Dr. Gibbs (Tr. 780-88) and Dr. Merrill, who treated the plaintiff for neck and arm pain (Tr. 792-97). On December 2, 2014, Dr. Gibbs noted that the plaintiff's HbA1c was 14 (Tr. 786). It is unclear what the ALJ relied on in this evidence to support his finding that the plaintiff's diabetes was well controlled.

In finding that the plaintiff's diabetes was not a severe impairment at step two of the sequential evaluation process, the ALJ noted that the plaintiff was treated for diabetic ketoacidosis in July 2015 and was assessed with likely nonadherence with his insulin

15

regimen (Tr. 21 (citing Tr. 845-46)). The treatment notes show that the plaintiff was initially seen in the emergency room with blood glucose of 700 (Tr. 845) and then was admitted for five days to McLeod Regional Medical Center for uncontrolled diabetes (Tr. 803, 843-46). It was noted that his HbA1c was greater than 18.5, "indicating either ineffective insulin therapy or significant nonadherence with therapies" (Tr. 845). While this was certainly relevant evidence for the ALJ to consider, the medical evidence reveals high blood glucose levels over a number of years. On April 29, 2009, the plaintiff's HbA1c was 13.9, and his blood glucose was 362, higher than Dr. West ever wanted to see it (Tr. 442). Dr. West noted on November 24, 2010, that the plaintiff's diabetes was "poorly controlled," and his most recent HbA1c was 12.5 (Tr. 439). In March 2011, state agency physician Dr. Wilson stated in his RFC assessment that the plaintiff's diabetes was "not controlled by labs" (Tr. 518). Dr. Gibbs wrote on August 12, 2013, that the plaintiff's sugars were up and down (Tr. 649). She wrote on September 12, 2013, that his HbA1c was "much improved", but it was still 9.7 (after having been as high as 15.9) (Tr. 651). On October 10, 2013, the plaintiff's blood glucose was 432 (Tr. 647), and, on April 15, 2014, the plaintiff's HbA1c was "very high at 15" (Tr. 639). Without further discussion by the ALJ, the undersigned cannot say that the finding that the plaintiff's diabetes was well controlled with medication was supported by substantial evidence.[5]

As discussed above, without discussion by the ALJ, it is unclear what evidence in Exhibits 26F and 28F the ALJ relied upon in finding that the plaintiff's neuropathy was well

---

[5] At step two, the ALJ also stated that the plaintiff "testified that his diabetes was well controlled" (Tr. 21). However, the testimony is not that clear. In the August 2015 hearing, the ALJ asked the plaintiff if his diabetes was controlled, to which the plaintiff replied, "I keep it controlled. They say I got what you call uncontrollable diabetic, you know" (Tr. 43).

controlled with medication.[6]  A review of the medical evidence indicates that, on October 1, 2012, an EMG showed changes in multiple muscles in the upper and lower extremities that were consistent with peripheral neuropathy associated with diabetes (Tr. 580).  The ALJ did not discuss this objective evidence.  On March 31, 2014, the plaintiff was experiencing numbness of right hand, foot, and lower leg and numbness and tingling in his left arm (Tr. 638).  He was treated on April 15, 2014, for numbness of his right arm, leg, and foot (Tr. 639).  Dr. Gibbs increased his gabapentin dosage to 300mg on March 11, 2015, due to numbness in his feet and hands.  If there was no relief, Lyrica was recommended (Tr. 783-84).  In April 2015, Dr. Armstrong saw the plaintiff for the burning in his feet.  The plaintiff reported that the pain had been ongoing for quite some time.  The pain was slow and had progressively worsened to the point that it was daily pain that limited his level of activity (Tr. 776).  On May 4, 2015, Dr. Armstrong wrote that Lyrica was not covered by the plaintiff's insurance.  The plaintiff continued to take gabapentin, "seeing no improvement" (Tr. 771).  On June 11, 2015, Dr. Gibbs noted that the plaintiff was being treated by a podiatrist for his peripheral neuropathy (Tr. 781), and on June 15, 2015, Dr. Armstrong wrote that the plaintiff still had burning in his feet (Tr. 766).

      As noted above, the ALJ found that the plaintiff's cervical spondylosis symptoms had not lasted for a period of 12 continuous months (Tr. 21).  However, treatment notes show that on April 29, 2009, Dr. Dawson noted the plaintiff's limited range of motion of his neck (Tr. 512).  On May 4, 2009, the plaintiff reported neck pain (Tr. 475).  On October 22, 2009, the plaintiff had neck pain and decreased range of motion of his cervical spine due to pain (Tr. 469).  On June 3, 2010, Dr. Dawson noted reduced range of motion

---

[6] Later in the RFC assessment, the ALJ stated, "Although the evidence submitted at the hearing level shows that the claimant suffered from diabetic peripheral neuropathy in his feet, the record shows his symptoms were fairly well controlled with medications when he was compliant; therefore, I do not find a need for the claimant to avoid foot controls or tasks involving rapid movements or response" (Tr. 22).  However, the ALJ cited no evidence in support of this finding.

17

of the neck and numbness of the left and right third, fourth, and fifth fingers (Tr. 511-12). On June 13, 2012, Dr. Wagner noted the plaintiff's progressive pain and weakness of his right arm and a diagnosis of cervical spine degenerative arthritis. He referred the plaintiff to a neurologist (Tr. 600). On July 17, 2012, an MRI confirmed mild multilevel cervical spondyloarthropathy (Tr. 590). On March 31, 2014, the plaintiff had numbness and tingling in his left arm, and on April 15 and May 29, 2014, he complained of neck pain (Tr. 639, 642). On May 4, 2015, Dr. Merrill wrote that the plaintiff had pain in his neck when he turned his head from side to side, as well as when he was looking up. When he turned his head, he had pain in his right arm. The plaintiff had limited motion of the cervical spine. Dr. Merrill suspected that the plaintiff had cervical spondylosis and radiculopathy. Dr. Merrill stated that he would recommend a cervical epidural, but realized the injection would not be approved by the plaintiff's insurance because lumbar epidurals had been denied. Dr. Merrill also suggested a Medrol dosepack, but was afraid this treatment would affect his blood sugars (Tr. 774). On June 15, 2015, Dr. Merrill reiterated the problem with the insurance company and referred the plaintiff to a neurosurgeon (Tr. 768-69).

As argued by the plaintiff, the above evidence documents the plaintiff's symptoms of neck pain that lasted longer than 12 months. While his complaints of pain were sporadic, there is continuous evidence of a limited range of motion that never improved. With regard to the ALJ's consideration of a lack of recommendation for surgery or physical therapy, the ALJ fails to note Dr. Merrill's desire to treat the plaintiff with injections, and the insurance company's failure to approve the recommended treatment. Also, Dr. Wagner indicated that with the plaintiff's history of diabetes, he did not think any type of surgery would be recommended (Tr. 602).

In light of the foregoing evidence, the ALJ's failure assign any weight to Dr. Gibbs' opinion, and the ALJ's failure to adequately explain how the opinion was inconsistent with the treatment records, the undersigned is unable to conclude that the ALJ's

assessment of Dr. Gibbs' opinion is supported by substantial evidence. Accordingly, the undersigned recommends that this matter be remanded for further consideration.

***Remaining Allegations of Error***

The court has found sufficient basis to remand this matter based on the ALJ's failure to properly consider the opinion of treating physician Dr. Gibbs. The plaintiff further argues that the ALJ failed to properly consider the opinion of state agency physician Dr. Wilson, who limited the plaintiff to two hours of standing and walking, and attributed too much weight to the opinion of state agency physician Dr. Heilpern, who did not have the full medical record before him (doc. 18 at 26–27). The plaintiff further argues that the ALJ failed to properly explain the RFC assessment as required by Social Security Ruling ("SSR") 96-8p and failed to properly evaluate his credibility as required by SSR 96-7p (doc. 18 at 28-34). Should the district court adopt this recommendation, upon remand, the ALJ will be able to reconsider and re-evaluate the evidence as part of the reconsideration. *Hancock v. Barnhart*, 206 F. Supp.2d 757, 763–64 n.3 (W.D. Va. 2002) (on remand, the ALJ's prior decision has no preclusive effect as it is vacated and the new hearing is conducted *de novo*). Accordingly, as part of the overall reconsideration of this claim upon remand, the ALJ should also consider and address these additional allegations of error raised by the plaintiff. *See Boone v. Barnhart*, 353 F.3d 203, 211 n.19 (3rd Cir.2003) (remanding on other grounds and declining to address claimant's additional arguments).

## **CONCLUSION AND RECOMMENDATION**

Now, therefore, based on the foregoing, it is recommended that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be remanded to the Commissioner for further consideration as discussed above.

IT IS SO RECOMMENDED.

| | |
|---|---|
| January 4, 2018 | s/Kevin F. McDonald |
| Greenville, South Carolina | United States Magistrate Judge |